Charles P. Kennedy
Gregory S. Gewirtz
Alexander Solo
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908.654.5000
Fax:    908.654.7866

*Attorneys for Plaintiff Congoo, LLC d/b/a Adblade*

**Document Filed Electronically**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CONGOO, LLC d/b/a ADBLADE, | : | |
| | : | Civil Action No. |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| REVCONTENT LLC and | : | |
| JOHN DANIEL LEMP, | : | |
| | : | |
| Defendants. | : | |
| | x | |

### COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff Congoo, LLC d/b/a Adblade ("Adblade"), by way of its complaint against Defendants RevContent LLC ("RevContent") and John Daniel Lemp ("Lemp"), alleges and avers as follows:

### NATURE OF THE ACTION

1.     This is an action for: (1) false and misleading representations in advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) unfair competition at common law; (3) violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*.; and (4) tortious interference with contractual and business relations.

2.     Plaintiff and Defendants are direct competitors in what has come to be known as "native" or "content" advertising, wherein online advertising is customized and integrated as part of published content on various Internet news or information sites.

## THE PARTIES

3.     Plaintiff Congoo is a limited liability company organized under the laws of the State of Delaware, having its principal place of business at 92 East Main Street, Suite 405, Somerville, New Jersey 08876.  Congoo's Adblade division is an online native advertising aggregator.  It pioneered native advertising, commencing in about 2008, and has been an industry leader since its inception.

4.     Upon information and belief, defendant RevContent is a Florida limited liability company, with its principal place of business at 5901 N. Honore Avenue, Sarasota, Florida 34243.  RevContent is qualified to do business in this judicial district and is doing business in New Jersey by regularly soliciting online — through various Internet sites, social media platforms and other means — native advertising Advertisers and Publishers.  RevContent regularly publishes or causes to be published native advertisements on numerous websites and social media platforms published in or otherwise accessible from New Jersey.

5.     Upon information and belief, defendant Lemp is founder and Chief Executive Officer of RevContent and resides at 2962 Dick Wilson Drive, Sarasota, Florida 34240-8730.  Upon information and belief, Lemp controls and is directly responsible for the actions of RevContent and has also acted in his personal and individual capacity with regard to the actions and conduct that are the subject of Plaintiff's claims herein.

## FEDERAL SUBJECT MATTER JURISDICTION

6.     The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, based on Plaintiff's claims for false and misleading advertising

against Defendants arising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  At all times relevant hereto, Defendants have maintained a substantial course of trade in or affecting "commerce," as that term is defined in Section 45 of the Lanham Act, 15 U.S.C. § 1127.

7.     The Court has supplemental jurisdiction over Plaintiff's claims for violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*., arising from the same facts as set forth within this Complaint.

8.     The Court has supplemental jurisdiction over Plaintiff's claims for common law unfair competition and tortious interference with business and contractual relationships arising from the same facts as set forth within this Complaint.

## PERSONAL JURISDICTION

9.     The Court has personal jurisdiction over RevContent because RevContent solicits, markets, sells and advertises its native advertising services in New Jersey, and publishes or causes to be published online native advertisements in New Jersey, all with the reasonable expectation that: (a) Advertisers in New Jersey purchase RevContent's native advertising services, (b) the native advertising created and developed by or through RevContent is published in New Jersey, and (c) consumers in New Jersey view the native advertising created and developed by RevContent on behalf of its Advertisers and purchase the products falsely advertised through that advertising.

10.    The Court has personal jurisdiction over Lemp because Lemp controls and is directly responsible for the actions of RevContent, has acted in his personal and individual capacity with regard to the actions and conduct the subject of Plaintiff's claims herein, and has used and continues to use and control RevContent in order to commit the conduct and actions set forth within this Complaint.

## VENUE

11.    Venue for this action properly lies in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

## FACTS COMMON TO ALL COUNTS

### A.    Native Advertising

12.    Commencing in about 2008, Plaintiff pioneered "native advertising" wherein online advertising is integrated as part of published content on various Internet news or information sites with high volume viewership.

13.    Plaintiff, and other native advertising companies, operate as an "intermediary" between (a) the actual advertisers, *i.e.*, those businesses offering products and/or services for sale (hereinafter "Advertisers"), and (b) the news, information and content websites that publish the native advertisements (hereinafter "Publishers" or "Publisher Websites").

14.    Plaintiff has been one of the largest content-style, native advertising platforms, enabling its Advertisers to reach over 300 million unique users on over 1000 top branded Publisher Websites on a monthly basis.  Hereafter, intermediary, native advertising companies, such as Plaintiff and defendant RevContent, are referred to as "Advertising Aggregators" or "Aggregators."

15.    Publishers derive substantial revenue by displaying advertising on their websites. In order to maximize advertising revenues generated by native advertising, Publisher Websites typically accept native advertising from those Advertising Aggregators that pay the highest rates, guaranteed minimums, or other revenues that are greater than those offered by a competitor.

16.    The typical native advertisement appearing on a Publisher Website is a photograph based image with a caption (referred to as a "photo plus text" ad).  Each such advertisement is

referred to as a "unit ad."  Every time the unit ad is shown on a user's device, it is referred to as an "impression" of that ad.

17.    Upon clicking or tapping a specific native advertisement unit ad (via either a web browser on a standard computer or by way of a mobile device), the user is typically directed to one of two types of third party websites: (a) a "content" based website, or (b) a "sales" based website.

18.    Plaintiff typically enters into exclusive arrangements with its Publishers for their mobile and desktop website delivery platforms.  Under such an arrangement, the Publisher will only publish Plaintiff's aggregated native advertising on behalf of Plaintiff's Advertisers.

   **B.**  **Plaintiff And Defendants Are Direct Competitors**

19.    Defendants engage in the same native advertising market and compete with Plaintiff for the same advertising space offered by the same Publishers.

20.    Many of RevContent's current Publishers are former clients of Plaintiff, which RevContent took from Plaintiff by false and misleading advertising, as set forth with greater specificity in this Complaint.

   **C.**  **Defendant Lemp's Prior Deceptive And Fraudulent Advertising Practices**

21.    Defendant Lemp is no stranger to false, deceptive, misleading, and fraudulent advertising practices through the Internet.  The same improper acts of Defendants that form the basis for the present Complaint were the subject of an action previously filed by the Federal Trade Commission ("FTC") against Lemp and other companies that he controlled.

22.    In particular, on November 13, 2012, the FTC filed suit against Lemp and two companies he owned or controlled, Clickbooth and IntegraClick, (collectively "the Lemp Defendants"), *Federal Trade Commission v. Clickbooth.com. LLC et al* Case No. 12-cv-9087 (N.D. Ill.), to obtain temporary, preliminary, and permanent injunctive relief, rescission or

reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for the Lemp Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52 (hereinafter "the FTC Litigation").

23.   On November 28, 2012, an Order was entered by the Court in the FTC action enjoining the wrongful acts committed by the Lemp Defendants.   A copy of that Order is attached hereto as **Exhibit A**.   Pursuant to the conditions of the FTC Order, Lemp paid $2,000,000 in fines and penalties.

24.   Among other terms, the FTC Order permanently restrained and enjoined Lemp and any other person in active concert or participation with him, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product, service, or program from misrepresenting or assisting others in misrepresenting, various material facts.

25.   Lemp is permanently restrained and enjoined under the FTC Order from failing to disclose, or assisting others in failing to disclose clearly and prominently, that the consumer will be subject to recurring charges (negative option membership plans) for additional shipments of goods or services unless and until the consumer takes specific steps to cancel the additional shipments.  (FTC Order ¶ I.B.3.)

26.   In addition, under the FTC Order, Lemp is required to promptly review all advertising to ensure compliance therewith, to promptly take steps to ensure that any marketing materials or advertising provided to him by any marketing affiliate or affiliate network is, in fact, the advertising or marketing material actually publically disseminated, and further, if any such advertising or marketing material does not comply with the requirements of the FTC Order, Lemp shall inform the affiliate or affiliate network in writing that approval to use such marketing

materials is denied and shall not pay any amounts to the affiliate or affiliate network for such marketing, including any payments for leads, "click-throughs," or sales resulting therefrom. (*Id.* ¶ I.B.4.)

27.   The Lemp Defendants' conduct that was enjoined in the FTC Order has continued and now forms the basis for the present Complaint and the specific claims alleged herein. The improper acts are false and misleading representation in advertising, and have damaged and continue to damage Plaintiff and cause Plaintiff irreparable harm. Lemp has used RevContent as a corporate insulator to try to protect him from complying with the terms and conditions of the FTC Order.

**D.    Defendants' False And Misleading Advertising**

28.   Defendants have published or caused to be published many impressions of native advertising unit ads ("Defendants' Ads") with various Publisher Websites, including Publisher Websites that were previous clients of Plaintiff.

29.   Defendants' Ads redirect consumers to corresponding third party advertising web sites owned or operated by advertisers working with Defendants. These third party advertisers are referred to as "Defendants' Advertisers."

30.   Many, if not most, of Defendants' Ads and the Advertisement Websites to which the Ads redirect unsuspecting consumers, employ false and misleading advertising intended to deceive innocent consumers out of significant monies by charging their debit cards or credit cards.

31.   Examples of Defendants' false and misleading advertising practices are demonstrated by the following three categories of products that are specifically advertised, promoted and sold by Defendants' Advertisers and to which Defendants' Ads specifically redirect the consumer.

**(1)   Defendants' Wrinkle Cream Product Advertisements**

32.   Defendants have published or caused to be published numerous Ads for anti-aging skin or wrinkle cream products (hereinafter "Wrinkle Cream products").

33.   For example, Defendants have published or caused to be published numerous Ads for Wrinkle Cream products on the websites conservativetribune.com, americanoverlook.com, and westernjournalism.com, all Publisher Websites that were previously clients of Plaintiff.

34.   When accessed by a consumer by a click or tap on a computer or mobile device, each Wrinkle Cream Ad redirects the consumer to the "landing page" of an Advertisement Website for the particular Advertiser's Wrinkle Cream product.

35.   The Wrinkle Cream Sites generally all use the same or similar false and misleading advertising practices and are often identical or nearly identical in format, appearance, and advertising claims made.   Attached hereto as **Exhibit B** is a copy of one exemplary Wrinkle Cream Site for an alleged Wrinkle Cream product marketed, promoted and offered for sale by Defendants and their Advertisers under the name and mark "Skin Youth" ("Skin Youth Site").

36.   The Skin Youth Site employs false and misleading advertising that are common to all of the Wrinkle Cream Sites, including:

(a)   The landing page of the Skin Youth Site is designed to appear as legitimate content based website in the form of an online magazine, utilizing the name *The Brighter Skin*. The site includes tabbed links at the top under headings such as "Home," "Fitness," "Gossip," "Recipes," "Yoga," "Parenting," "Fashion" — ostensibly to direct the consumer to other sections of the fake magazine — and further includes a prominent graphic link at the top claiming "Latest issue out now!" and inviting the consumer to "CLICK HERE — only 99¢ an issue."

(b)   The Skin Youth Site and most of the other Wrinkle Cream Sites promoted by Defendants use a phony, manipulated version of the May 2012 magazine cover of *Woman's Day*

that features prominent image of health and fitness celebrity, "Dr. Oz," thereby deceiving the consumer to believe that the Skin Youth wrinkle cream product was featured in that edition of *Woman's Day* and that it was endorsed or discussed in a feature article by Dr. Oz.

(c)   The landing page of the Skin Youth Site and most other Wrinkle Cream Sites promoted by Defendants use a "rolling" side box to direct a consumer to an online order form page.   Included within the rolling box on the landing page of the Skin Youth Site is the advertising claim: "By using the links below, you'll be able to try Skin Youth Anti-Aging Cream 100% Free!"  In fact, this statement is false and misleading.

(d)   The landing page of the Skin Youth Site — and other Wrinkle Cream Sites — further features the covers of several legitimate magazines, such as "*New Beauty*," "*Women's Health*," "*allure*," "*New You*," "*SHAPE*," and "*Good Housekeeping*," with likenesses and identities of various celebrities such as Sharon Stone, Jamie Lee Curtis, and Brooke Shields. Headlines of the magazine covers are circled, in an attempt to deceive and mislead consumers that the Skin Youth wrinkle cream product has been the subject of or otherwise featured in those magazines.   None of this is true, and the use of magazine covers, celebrities, and circled headlines to claim is false and misleading.

(e)   Upon providing the solicited personal information on Skin Youth Order Form Page No. 1, the consumer is then directed to a second order form page that seeks the consumer's credit/debit card information (hereinafter "Skin Youth Order Form Page No. 2").  Skin Youth Order Form Page No. 2 expressly states that the Skin Youth wrinkle cream product is "FREE" and that "You're Almost Done! Just Pay Shipping."   The "TOTAL" price for the "free" Skin Youth wrinkle cream product is advertised as only $4.97, which is claimed as the "shipping" cost

for the "free" wrinkle cream product.  The representation that the consumer only pays the sum "total" of or about $4.97 as "shipping" for the wrinkle cream product is false and misleading.

(f)   The Skin Youth wrinkle cream product is not free and does not cost only $4.97 for shipping.  Located far below the consumer's credit card information is the statement: "By submitting, you concent [sic] to having read and agree to our Terms and Conditions and after your 14 day trial has expired, being enrolled in our membership program for $94.94 plus shipping per month."

(g)   The Skin Youth Terms and Conditions are complicated and very difficult to understand.  In essence, by acquiring the "free" Skin Youth wrinkle cream product, consumers are automatically enrolled in a negative option membership program whereby 14 days from the date of their purchase of the "free" wrinkle cream product, the consumer is charged $94.94, plus shipping.  Upon information and belief, many consumers do not discover the monthly charge of $94.94, plus shipping, until after receiving shipments of the Skin Youth wrinkle cream product.  Upon further information and belief, consumers encounter difficulty in canceling their "membership," are charged excessive cancellation fees, and are further charged "restocking" fees for any returned product.

### (2)   Defendants' Diet Pill Advertisements

37.   Defendants have published or caused to be published, numerous Ads for an alleged dietary weight loss supplement marketed, under the name "Uber Trim."  Attached as **Exhibit C** to this Complaint is a copy of a Defendant Ad for Uber Trim published on the Internet Publisher Website, www.diply.com (hereinafter "the Diet Pill Ad").

38.   When accessed or tapped by a consumer, the Diet Pill Ad redirects the consumer to the landing page of an Advertisement Website for Uber Trim ("the Diet Pill Site").

39.   The Diet Pill Ad is in the form of a "photo-plus-text" ad that is comprised of side-by-side photographic images purportedly representing a "before/after" comparison of the same woman (wearing a yellow top) with a caption beneath that states: "New Diet Pill Kills Too Much Fat?  This Diet is Taking Over NY."

43.   The Diet Pill Landing Page is fraught with numerous false, misleading, deceptive, and fraudulent advertising claims made by Defendants and their Advertisers, summarized as follows:

(a)   The Diet Pill Landing Page is designed to appear as a legitimate content-based website in the form of an online magazine under the name *Health Trends Daily*.

(b)   The Diet Pill Landing Page further includes tabbed links at the top under such headings as "Home," "Health," and "Fitness & Nutrition" to direct the consumer to other sections of the online magazine.  The advertising format of the Diet Pill Landing Page is further designed to appear as a "news" item: it also includes a "postdate" of "Thursday, Dec 3rd 2015," followed by the alleged publisher identifier *Health Trends Daily*.

(c)   The Diet Pill Landing Page uses several photo images of health and fitness celebrity, "Dr. Oz."  Beneath the final photo of Dr. Oz appears a purported "disclaimer" that reads "Video Credit: Dr. Oz has not endorsed any specific product, only the ingredient."  The advertisement  continues: "According to a prominent Celebrity Doctor – the product works in more than one way. The first way is it goes in and causes the body to burn glucose (sugar), and burn fat, mainly in the liver."  The Diet Pill Landing Page cites Dr. Oz as explaining how the "product," *i.e.*, the Uber Trim diet pill product, works in the body.

(d)   At the bottom of the Diet Pill Landing Page is a purported "disclosure" directed towards the entire Diet Pill Site (the "Diet Pill Disclosure") that reads, in relevant part, as follows:

> THIS IS AN ADVERTISEMENT AND NOT AN ACTUAL NEWS ARTICLE, BLOG, OR CONSUMER PROTECTION UPDATE.
>
> . . . .
>
> It is important to note that this site and the stories depicted above is to be used as an illustrative example of what some individuals have achieved with this/these products. This website, and any page on the website, is based loosely off a true story, but has been modified in multiple ways including, but not limited to: the story, the photos, and the comments. Thus, this page, and any page on this website, are not to be taken literally or as a non-fiction story. This page, and the results mentioned on this page, although achievable for some, are not to be construed as the results that you may achieve on the same routine. I UNDERSTAND THIS WEBSITE IS ONLY ILLUSTRATIVE OF WHAT MIGHT BE ACHIEVABLE FROM USING THIS/THESE PRODUCTS, AND THAT THE STORY DEPICTED ABOVE IS NOT TO BE TAKEN LITERALLY. This page receives compensation for clicks on or purchase of products featured on this site. The compensation received may influence the advertising content, topics or posts made in this page. That content, advertising space or post may not always be identified as paid or sponsored content. The owner(s) of this page are compensated to provide opinion on products, services, websites and various other topics. Even though the owner(s) of this page receives compensation for our posts or advertisements, we always give our honest opinions, findings, beliefs, or experiences on those topics or products. The views and opinions expressed on this page are purely that of the owners. Any product claim, statistic, quote or other representation about a product or service should be verified with the manufacturer, provider or [ ]

(e)   Another problem with the Diet Pill Disclosure is that in order for a consumer to even see it, the consumer must scroll extensively and to the very bottom of the Diet Pill Landing Page before the Diet Pill Disclosure is displayed.  In sum, the Diet Pill Disclosure fails to cure any of the false, misleading, and deceptive advertising claims and practices with respect to the Diet Pill Site.

44.   Diet Pill Order Form Page No. 1 is titled "QUALIFY FOR YOUR BOTTLE BELOW" and seeks the following personal information from the consumer: First Name, Last

Name, Email and Phone.   Following the data entry form fields for the above requested information is the following statement:

> We take great pride in the quality of our products and are confident that Uber Trim is one of the most powerful dietary supplements on the market today. If for any reason you do not find this product is right for you we will gladly give you a full refund, no questions asked. You have nothing to lose except for the weight.

The above statement appears on each Diet Pill Order Form Page beneath the data entry form fields of the corresponding page.

45.    Diet Pill Order Form Page No. 2 opens with the exclamatory statement:

**APPROVED! 1 Bottle Confirmed**
Just pay a small shipping fee
In Stock - Sell Out Risk: **HIGH**

Diet Pill Order Form Page No. 2 advises that the consumer has been "approved" for one (1) bottle of Uber Trim and continues by advising the consumer that the price for one (1) bottle of a 30-day supply (60 capsules) of Uber Trim is only $4.97 and that shipping is "free," although elsewhere the Diet Pill Site states that the Uber Trim diet pill product is "free" and that shipping is $4.97.

46.    Tapping the "Tap To Proceed" button on Diet Pill Order Form Page No. 2 directs the consumer to Diet Pill Order Form Page No. 3.  Diet Pill Order Form Page No. 3 is titled "VERIFY YOUR SHIPPING INFO" and states beneath that heading: "Please submit shipping details for guaranteed delivery. Your order is almost complete. Just pay a small shipping fee."

47.    Tapping the "Tap To Proceed" button on Diet Pill Order Form Page No. 3 directs the consumer to Diet Pill Order Form Page No. 4.  Diet Pill Order Form Page No. 4 is titled "Confirm Your Payment Info" and requests the consumer's credit card information, all via data entry form fields: Credit Card Type, Credit Card Number, Expiry Date and CVV.

48.     Once a consumer enters his/her credit card information and taps the "Place Your Order" button, the process is complete — the order has been taken, the credit card has been processed and the consumer has purchased Uber Trim for what would appear to be the sum total of only $4.97.

49.     By tapping the "TERMS" link as it appears on the respective Diet Pill Order Form Pages, the consumer is directed to a lengthy separate web page regarding "terms and conditions" for purchasing the Uber Trim diet pill product (hereinafter the "Diet Pill Terms and Conditions").

50.     Contrary to the repeated advertising claims of "free" and "risk free" product, the Diet Pill Terms and Conditions reveal that by "purchasing" a bottle of a 30-day supply of the Uber Trim diet pill product, the consumer is enrolling in a negative option membership plan for that product and that the consumer will be charged $89.97 if the consumer does not cancel his/her membership within 14 days of the date of placing an order for the Uber Trim diet pill product.

51.     The negative option program is first disclosed in the Diet Pill "Terms and Conditions" page that must be opened separately while in the product website.  In order to locate the disclosure of the negative option program, a consumer must first see and understand the tiny "TERMS" link contained at the very bottom of the Order Form Pages, tap that link in order to be directed to the Diet Pill Terms and Conditions web page, and then scroll through highly confusing Diet Pill Terms and Conditions fine print to locate the "Trial Orders" section which discloses the negative option program.  A consumer will not know he or she will be charged more than $4.97 without tapping on the "TERMS" link at the bottom of the page and opening the Terms and Conditions page.

52.     By ordering the "free" Uber Trim diet pill product and paying "only" $4.97 for shipping, the unsuspecting consumer is "automatically" enrolled in a hidden negative option "membership program", whereby the consumer is charged $89.97 only 14 days after submitting his/her an order for the Uber Trim diet pill product *unless* the consumer cancels his/her membership in accordance with the undisclosed terms and conditions.

53.     Even worse, the consumer will automatically be sent another bottle of the Uber Trim diet pill product 30 days after placing the initial order and charged another $89.97, plus shipping in the amount of $4.97.  As such, unless the innocent consumer notices the initial charge of $89.97, plus shipping in the amount of $4.97, on his/her credit card and cancels membership in the negative option membership plan, the consumer will be charged the sum total of $189.88 within 30 days of placing the initial order for a dietary weight loss supplement.

54.     Upon information and belief, in most instances the consumer's "free" trial typically does not even arrive within 14 days of the date of the initial order, thereby making it impossible for the consumer to undertake a "trial" of the Uber Trim diet pill product.  Many consumers, therefore, do not discover the monthly charge of $89.97, plus shipping, until *after* receiving multiple shipments totaling many hundreds of dollars.

55.     The Diet Pill Site and the advertising therein deceitfully represents that the consumer can obtain a "free" trial of the Uber Trim diet pill product by only paying $4.97 for shipping.  The representation that the product is free and the consumer need only pay a small fee for shipping is false deceptive and misleading.

56.     The Diet Pill Site advertises throughout that trying UberTrim is *without risk*. Specifically, the claim is made on each of the Order Form Pages comprising the Diet Pill Site that:

> If for any reason you do not find this product is right for you, we will gladly give you a full refund, no questions asked. You have nothing to lose except for the weight!

57.     This claim, however, is expressly contradicted by various terms of the Diet Pill Terms and Conditions.  More specifically, the "Return Policy" section of the Diet Pill Terms and Conditions (the "Diet Pill Return Policy") specifically states that:

> We will credit one returned unopened product per customer if the received package is post marked within 30 days of the original order date and included with a RMA number obtained from customer service. . . . Any merchandise must be returned at the customer's expense and must have an RMA number marked on it. . . . If you are not satisfied with the product you purchase we will provide a reimbursement of the product cost minus $15 dollars for restocking fee per unit on unused product. No refunds will be issued for any used product.

58.     The promise of a free, no risk trial for Uber Trim is false and misleading in light of the express terms and conditions of the Diet Pill Return Policy.  The promise of a "full refund, no questions asked" is contradicted by the $15 restocking fee, which is more than three times the initial cost of the product, *i.e.*, the $4.97 shipping charge.  If a consumer is "not satisfied" with the Uber Trim diet pill and wants to return the product, it is therefore unavoidable that the consumer has opened and tried the product.  The assertion that "no refunds will be issued for any used product" is inconsistent with the representation of a full refund and constitutes false, deceptive and misleading advertising.

59.     Additionally, the "Cancellation Fee" section within the Terms and Conditions contradicts the promise of a free, no risk trial. The "Cancellation Fee" provision states:

> If you wish to cancel your account without returning the product you may incur a small fee to avoid having to return the product. This fee is a small one time charge and may vary but it will always be lower than the full price of the product.

60.     The Cancellation Fee contradicts the promise that Defendants and their Diet Pill Advertisers "will gladly give you a full refund, no questions asked."  It is deceptive and

misleading to say there is no scenario in which a full refund will not be issued; meanwhile, buried in the Diet Pill Terms and Conditions is an undefined fee for cancelling.

**(3)      Defendants' Muscle Building ("Crevalor") Product Advertisements**

61.      Defendants have published or caused to be published numerous Ads for an alleged muscle building dietary supplement marketed, promoted and offered for sale under the name and mark "Crevalor."   Attached as **Exhibit D** to this Complaint is a copy of a Defendant Ad for Crevalor published on the Internet Publisher Website, www.conservativetribune.com (hereinafter "the Muscle Pill Ad") and captured via a mobile device.

62.      When accessed or tapped by a consumer, the Muscle Pill Ad redirects the consumer to the landing page of an Advertisement Website for Crevalor and a second, "adjunct" alleged muscle building dietary supplement marketed, promoted and offered for sale under the name and mark "Megatropin" (hereafter Crevalor and Megatropin, collectively referred to as "Crevalor").

63.      The Muscle Pill Ad follows the typical native advertising format of a "photo-plus-text" ad and is comprised of a shirtless, muscular and heavily tattooed man with a caption beneath that states: "'Legal Steroid' Turning Men Into Beasts."

64.      When the Muscle Pill Ad is "tapped" by a consumer, the consumer is directed or redirected via the consumer's mobile device to the Muscle Pill Site, which is designed and formatted to display and appear as an online magazine under the name "*Men's Health Life.*"

65.      The Muscle Pill Landing Page employs false, misleading, deceptive and fraudulent advertising claims made by Defendants and their Advertisers, summarized as follows:

(a)      The Muscle Pill Landing Page is intentionally designed to appear as a legitimate content based website in the form of an online and mobile accessible magazine under the name

*Men's Health Life*.  The name and logo design for "*Men's Health Life*" is an obvious attempt to falsely represent an endorsement of the Crevator product by the respected magazine and website, "*Men's Health*" and is specifically designed to appear just like the authentic *Men's Health* magazine and site.  Defendants' practices are false and misleading to consumers.

(b)     The fake *Men's Health Life* website used by Defendants and their Advertisers expressly represents an endorsement of the Crevalor muscle pill product.  Since there is no real *Men's Health Life* magazine, Crevalor could not have been "featured" in a non-existent magazine publication.  Immediately below the fake *Men's Health Life* magazine cover is the statement: "SPECIAL RISK FREE BOTTLE OFFER ONLINE."  As set forth further within this Complaint, this statement is literally false — the offer for the Crevalor muscle pill product is not in any sense "risk free."

(c)     The Muscle Pill Landing Page features a non-functional drop down menu to navigate the site, a prominent *Men's Health Life* title to the site, and a sensational title to the purported article that reads "New 'Legal Steroid' That Boosts Muscle Growth By 200% — Top Trainers and Athletes Reveal Safest Steroid Alternative To The Public."

(d)     The Muscle Pill Landing Page uses "before/after" photo depictions or testimonials of celebrities under the express heading "Celebrity Before and Afters."  The celebrities featured on the Muscle Pill Landing Page in "before/after" photo testimonials include Chris Hemsworth, Mel Gibson, Hugh Jackman and Mark Wahlberg.  None of the depicted celebrities used the Crevalor muscle pill product or endorse the product.  The "before/after" depictions are false and misleading.

(e)     The Muscle Pill Landing Page continues with numerous "comments" from claimed users and intended users of the Crevalor muscle pill product.  Besides touting the

amazing effects of the product, the comments also promote that the Crevalor muscle pill product is being given away for *free.*

(f)     The Muscle Pill Landing Page is comprised of additional claims and statements directed towards the cost (or alleged lack thereof) of the Crevalor muscle pill product and the dwindling supply of the product.  Such statements and claims include the following:

- "Today, we are leaking their secret and teaching you how to get muscular celebrity bodies risk free."

- "The free trial bottle of Crevalor was delivered in a few days . . ."

- "Both Crevalor and Megatropin arrived within 4 days of having placed my order online for the free trials and were inexpensive to ship."

- "EXCLUSIVE FOR OUR READERS ONLY! WHILE SUPPLIES LAST (Risk *free trials* still available) As of Thursday, December 3, 2015 there are still risk free trials available. Act Fast!"

(g)     The Muscle Pill Landing Page makes additional false and misleading advertising claims concerning the cost of the Crevalor muscle pill product.  The Muscle Pill Landing Page features a prominent photo of a bottle of the Crevalor muscle pill product and above that graphic is the statement: "**STEP 1**: Click here to get a risk free trial bottle of Crevalor."  Immediately below the graphic is the statement: "Pay just $4.95 S/H."  Following that is another prominent photo featuring a bottle of "Megatropin," and the statement: "**STEP 2**: Click here to get a risk free trial bottle of Megatropin."  Immediately below the graphic is the statement: "Pay just $4.95 S/H."  In truth, neither muscle pill product is "risk free" and the total cost is more than the claimed "$4.95" for shipping and handling.  Accordingly such statements are false and misleading.

(h)     At the very bottom of the Muscle Pill Landing is a "disclosure" ("the Muscle Pill Disclosure") that reads as follows:

**Men's Health Life**

Copyright © 2014 Men's Health Life
Publications. All rights reserved.

## THIS IS AN ADVERTISEMENT AND NOT AN ACTUAL NEWS ARTICLE, BLOG, OR CONSUMER PROTECTION UPDATE.

This content is sponsored by Crevalor and Megatropin.

The Celebrities featured do not endorse the products mentioned on the page.

. . . .

It is important to note that this site and the stories depicted above is to be used as an illustrative example of what some individuals have achieved with this/these products. This website, and any page on the website, is based loosely off a true story, but has been modified in multiple ways including, but not limited to: the story, the photos, and the comments. Thus, this page, and any page on this website, are not to be taken literally or as a non-fiction story. This page, and the results mentioned on this page, although achievable for some, are not to be construed as the results that you may achieve on the same routine. I UNDERSTAND THIS WEBSITE IS ONLY ILLUSTRATIVE OF WHAT MIGHT BE ACHIEVABLE FROM USING THIS/THESE PRODUCTS, AND THAT THE STORY DEPICTED ABOVE IS NOT TO BE TAKEN LITERALLY.

. . . This page receives compensation for clicks on or purchase of products featured on this site. . . . The compensation received may influence the advertising content, topics or posts made in this page. That content, advertising space or post may not always be identified as paid or sponsored content.

The owner(s) of this page are compensated to provide opinion on products, services, websites and various other topics. Even though the owner(s) of this page receives compensation for our posts or advertisements, we always give our honest opinions, findings, beliefs, or experiences on those topics or products. The views and opinions expressed on this page are purely that of the owners. Any product claim, statistic, quote or other representation about a product or service should be verified with the manufacturer, provider or other party in question.

   (i) According to the Muscle Pill Disclosure, *Men's Health Life* as an actual magazine and content site and the celebrities "before/after" endorsements are not true or authentic.  Accordingly, such statements and representations are false and misleading.

66.     Throughout the Muscle Pill Landing Page are many links directing the consumer to try a "risk free" bottle of the Crevalor muscle pill product for "just $4.95."  Upon tapping any of the embedded links, the consumer is directed to Muscle Pill Order Form Page No. 1.

67.     Muscle Pill Order Form Page No. 2 is primarily directed towards obtaining the consumer's credit card information.  Immediately above the credit card information data entry form fields are the following statements:

| | |
|---|---|
| Shipping | $9.95 |
| Discount | -$5.00 |
| **Total** | $4.95 |

(In Stock - ships within 24 hours)

Only 7 Trials Remain!

68.     The total cost of $4.95 for the Crevalor muscle pill product is the *only* cost mentioned on the entire Muscle Pill Site for the product and the express cost breakdown, as set forth above is the express, stated cost for purchasing a "risk free" bottle of the Crevalor muscle pill product.

69.     Tapping a "Terms and Conditions" link on either Order Form Page directs the consumer to a separate web page than the rest of the advertising content comprising the Muscle Pill Site and is comprised of lengthy "terms and conditions" regarding the purchase of the Crevalor muscle pill product, the automatic enrollment in a negative option membership program and the excessive costs of the product that are automatically charged to the consumer (hereinafter, the "Muscle Pill Terms and Conditions").

70.     According to the Muscle Pill Terms and Conditions, by purchasing a "risk free" "free" bottle of the Crevalor muscle pill in which the consumer pays "just $4.95 for shipping and handling," the consumer is actually enrolling in a hidden negative option membership plan for

the Crevalor muscle pill product, which commences with a credit card charge of $89.99 14 days after the consumer places his/her order for the muscle pill product.  The "AUTO SHIPMENTS, MEMBERSHIP AND BILLING" section within the lengthy Terms and Conditions states:

> By placing your order you will be receiving a 14 day evaluation for the price of $4.95. . . . You will also be enrolling into our membership program and you will be charged $89.99 per month starting 14 days from today and every 30 days thereafter unless cancelled.

71.     The consumer is also automatically sent another bottle of the Crevalor muscle pill product 30 days after placing the initial order and charged another $89.99, plus shipping in the amount of $4.95.  As such, unless the innocent consumer immediately notices the initial charge of $89.99, plus shipping in the amount of $4.95, on his/her credit card and cancels membership in the negative option membership plan, the consumer will be charged the sum total of $189.88 within 30 days of placing the initial order for the Crevalor muscle pill product.

72.     Upon information and belief, in most instances the consumer's "free" trial of the Crevalor muscle pill product typically does not even arrive within 14 days of the date of the initial order, thereby making it impossible for the consumer to undertake a "trial" of the product. Many consumers, therefore, do not discover the monthly charge of $89.99, plus shipping, until *after* receiving multiple shipments totaling many hundreds of dollars.

73.     As such, the representations that the product is free and the consumer need only pay a small fee for shipping is false and misleading.

74.     The Muscle Pill Site's claim that ordering the Crevalor muscle pill product is without risk is undermined and expressly contradicted by the various terms of the Muscle Pill Terms and Conditions.  More specifically, the "Return Policy" section of the Muscle Pill Terms and Conditions (the "Muscle Pill Return Policy") specifically states that: "I understand that if I

cancel my membership after the 14-day trial period, I will be charged a $29.99 membership cancellation fee."

75.     In the event that the consumer fails to cancel the negative option membership plan within 14 days of the date of placing an order, the consumer will be charged $89.99 for the product plus an additional $29.99 membership cancellation fee, for a total of $119.98.

76.     In addition, all returns are subject to a $19.95 "restocking fee," regardless of when the negative option membership plan is cancelled and the muscle pill product returned.

77.     The representation of a free, no risk trial for the Crevalor muscle pill product is false and misleading in light of the express terms and conditions of the Muscle Pill Return Policy.   The repeated promises of free product, low shipping charges and "no risk" are all contradicted by the actual charge of $89.99 for the product, an additional $29.99 membership cancellation fee, and a $19.95 "restocking fee."

78.     The above description of the various advertising claims comprising the Muscle Pill Site are not exhaustive, but are merely meant to present examples of such claims by Defendants and their Advertisers to mislead, deceive and defraud consumers into enrolling into a negative option membership plan, based on false and misleading representations in advertising.

79.     Defendants have employed the above stated false and misleading representations in advertising to generate greater income from their Ads and those of Defendants' Advertisers in order to offer its services at more attractive rates than Plaintiff can offer, and to take Plaintiff's business, erode Plaintiff's market share and damage Plaintiff's goodwill in association with Plaintiff's native advertising business.

80.     In approaching Plaintiff's Publishers for business, Defendants have provided access on the RevContent.com website for those Publishers to sample and test advertisements

that Defendants represent they will use for the Publishers' business.  Using specific "spoofing" software techniques, Defendants fraudulently display a different set of ads to the Publishers (ads without the false and misleading representations set forth in this Complaint), than the actual ads that are displayed to the public (the Publishers' customers).  The actual ads that are displayed to the public through the Publishers' Websites are those ads with the false and misleading representations discussed above.  By these acts, Defendants defraud the Publishers and further falsely and misleadingly represent the nature and characteristics of their ads to Publishers and the public.

81.     Defendants have also used their false and misleading representations as to the characteristics of their advertisements which they will place on a Publisher's site to take away Defendants' business, to erode Plaintiff's business, and to injure Plaintiff's goodwill.

## FIRST CLAIM FOR RELIEF
### False Advertising Under, Section 43(a) Of The Lanham Act, 15 U.S.C. § 1125(a)

82.     Plaintiff repeats, reiterates, and realleges each and every allegation previously set forth in this Complaint in its entirety, as if set forth fully in this paragraph.

83.     By their acts set forth above, Defendants in connection with their services have used and continue to use false and misleading descriptions of fact and false and misleading representations of fact in commercial advertising that misrepresent the nature, characteristics and qualities of their or another person's services or commercial activities, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

84.     Defendants' false and misleading descriptions and representations associated with Defendants' Ads and the Ads of Defendants' Advertisers are material and are likely to influence the consumer.

85.     By its false and misleading representations in advertisements, Defendants and Defendants' Advertisers have been able to generate greater income from ads and thereby to offer their services at more attractive rates to Plaintiff's Publishers than Plaintiff can because Plaintiff does not employ false and misleading representations in its advertising.  Thus, by their acts of false and misleading advertising, Defendants have succeeded in eroding significantly Plaintiff's market share and in injuring Plaintiff's goodwill.

86.     The damages to Plaintiff's business and goodwill from Defendants' false and misleading representations are irreparable because the full extent of such damages cannot be precisely measured and compensated by a monetary award.

87.     Defendants continue to do the acts complained of herein, and unless restrained and enjoined, Defendants will continue to do so, all to Plaintiff's irreparable damage.  Plaintiff's remedy at law is not adequate to compensate it for the injuries received and threatened.

88.     All of the aforementioned acts of false and misleading representations in advertising by Defendants have been willful and committed with the intent to deceive consumers and Publishers.

### SECOND CLAIM FOR RELIEF

### Common-Law Unfair Competition

89.     Plaintiff repeats, reiterates, and realleges each and every allegation previously set forth in this Complaint in its entirety, as if set forth fully in this paragraph.

90.     By their acts set forth above, Defendants have willfully engaged in acts constituting unfair completion under the common law of the State of New Jersey.

91.     Defendants are unfairly competing by making false and misleading representations in their advertising and those of their Advertisers that result in higher sales conversion and higher revenue that Defendants can offer Publishers.  Plaintiff cannot compete

fairly with Defendants because Plaintiff complies with the law and does not use false and misleading advertising.

92.     Had Defendants competed fairly and not engage in the false and fraudulent advertising practices as detailed herein, Plaintiff would not have been at a disadvantage in competition with Defendants.  Instead, Plaintiff has been forced to match Defendants' rates which, have eroded Plaintiff's profit with respect to those Publishers that continue to engage Plaintiff's advertising services.

93.     Defendants have also committed acts of unfair competition through their fraudulent representations to the Publishers.  Defendants continue to do the acts complained of herein, and unless restrained and enjoined, Defendants will continue to do so, all to Plaintiff's irreparable damage.  Plaintiff's remedy at law is not adequate to compensate it for the injuries received and threatened.

94.     All of the aforementioned acts of false and misleading representations in advertising by Defendants have been willful and committed with the intent to deceive consumers.

**THIRD CLAIM FOR RELIEF**

**New Jersey Consumer Fraud, N.J.S.A. 56:8-1 _et seq._**

95.     Plaintiff repeats, reiterates, and realleges each and every allegation previously set forth in this Complaint in its entirety as if set forth fully within this paragraph.

96.     By their acts set forth above, Defendants have used unconscionable commercial practices, deception, false promises, misrepresentations, and the knowing concealment or omission of a material fact with the intent that others will rely upon such concealment or omission, in connection with the advertisement of merchandise through Defendants' false and

misleading descriptions and representations in Defendants ads and the ads of Defendants' Advertisers, in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et. seq.*

97.    By reason of the acts set forth above by Defendants, Plaintiff has suffered and shall continue to suffer damage to its business, reputation and good will and the loss of sales and profits Plaintiff would have made but for the acts of the Defendants.

98.    The Defendants continue to do the acts complained of herein, and unless restrained and enjoined, the Defendants, each and both of them, will continue to do so, all to Plaintiff's irreparable damage.  It would be difficult to ascertain the amount of compensation which could afford Plaintiff adequate relief for such continuing acts.  Plaintiff's remedy at law is not adequate to compensate it for the injuries received and threatened.

**FOURTH CLAIM FOR RELIEF**

**<u>Tortious Interference With Contractual And Business Relationships</u>**

99.    Plaintiff repeats, reiterates, and realleges each and every allegation previously set forth in this Complaint in its entirety as if set forth fully within this paragraph.

100.    Plaintiff had long-standing business relationships and exclusive contracts with various Publishers.

101.    Defendants were aware of those existing relationships and exclusive contracts between Plaintiff and such Publishers, and, with full knowledge of those business and contractual relationships, Defendants intentionally interfered with Plaintiff's relationships by actively pursuing those Publishers, offering higher rates for their native advertising business that would be obtained through false and misleading ads as set forth herein, and obtaining business from those Publisher Websites.

102.    While Plaintiff's exclusive contracts with its Publishers provided that said Publishers were required the publisher to give Plaintiff 90 days written notice of cancellation,

Defendants induced many Publishers to breach their contracts by terminating their relationships with Plaintiff without notice.

103.    Defendants were able to convince said Publishers to break their exclusive contract with Plaintiff by employing false and misleading advertising that allowed for financial terms that could only be paid to said Publishers because of Defendants' false and misleading advertising as detailed within this Complaint.

104.    As a result of the Defendants' interference and false and fraudulent advertising practices, many of Plaintiff's Publishers have either switched entirely or in large part to Defendants, and have terminated or breached their contracts with Plaintiff, causing Plaintiff to sustain significant and irreparable damages in the form of lost accounts, losses of market share, and injury to Plaintiff's long established goodwill and reputation in the industry.

105.    The aforementioned conduct constitutes tortious interference with contractual and business relations of Plaintiff and has resulted and will continue to result in damages to Plaintiff. Plaintiff has suffered and shall continue to suffer an ascertainable loss.

106.    As a result of the tortious interference and unfair competition practices by Defendants and their false, deceptive, misleading and fraudulent advertising as detailed in this Complaint, Defendants have further created an environment where Publishers are no longer willing to agree to exclusive agreements, thereby reducing Plaintiff's value as a company in the native advertising industry.

107.    Defendants continue to do the acts complained of herein, and unless restrained and enjoined, Defendants will continue to do so, all to Plaintiff's irreparable damage.  Plaintiff's remedy at law is not adequate to compensate it for the injuries received and threatened.

108.    All of the aforementioned acts of false and misleading representations in advertising by Defendants have been willful and committed with the intent to deceive consumers.

<strong><u>DEMAND FOR RELIEF</u></strong>

**WHEREFORE**, Plaintiff demands the entry of judgment in its favor and against Defendants as follows:

A.      a preliminary and permanent injunction against Defendants, their respective officers, agents, servants, employees, attorneys, and all those in active concert or participation with them from, in commerce, including any Internet or online web sites, any advertising or promotional material that includes any false or misleading descriptions of fact or representations of fact, including (1) negative option membership plans, (2) representation of free trial products or trial products at a set price that does not prominently set forth additional charges and conditions such as restocking fees and negative option membership plans, (3) untrue celebrity endorsements, (4) false "before/after" photographs or comments, (5) mocked up or materially modified magazine covers, (6) references to magazines, articles or other sources in which the product was not featured, and (7) any other false or misleading statements;

B.      an accounting to determine the profits Defendants have made in connection with their services provided to customers that have employed such false and misleading descriptions of fact or representations of fact, and an award to Plaintiff of such profits;

C.      an award of compensatory damages arising out of Defendants violations, and a trebling of such award, as provided by 15 U.S.C. § 1117;

D.      an award of threefold the damages sustained by Plaintiff, and an award of reasonable attorney's fees, filing fees and the reasonable costs of suit under N.J.S.A. 56:8-19;

E.     an award to Plaintiff of its reasonable attorney's fees and costs in the action on the ground that this is an exceptional case; and

F.     such other and further relief as the Court may deem just and necessary.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Congoo, LLC d/b/a Adblade demands a jury trial on all issues so triable to a jury.

Respectfully submitted,

LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK, LLP
*Attorneys for Plaintiff Congoo LLC d/b/a Adblade*

Dated: January 22, 2016                    By:___s/  Charles P. Kennedy_____
Charles P. Kennedy
Tel:    908.654.5000
E-mail:ckennedy@lernerdavid.com
litigation@lernerdavid.com

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

The undersigned hereby certifies, pursuant to Local Civil Rule 11.2, that with respect to the matter in controversy herein, neither (insert plaintiff or defendant) nor (insert plaintiff's or defendant's) attorney is aware of any other action pending in any court, or of any pending arbitration or administrative proceeding, to which this matter is subject.

Dated:___January 22, 2016_____        LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK, LLP
*Attorneys for Plaintiff Congoo, LLC*
 *d/b/a Adblade*

By:___s/  Charles P. Kenndy_____
Charles P. Kennedy
Tel:    908.654.5000
E-mail: ckennedy@lernerdavid.com
litigation@lernerdavid.com