**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CONGOO, LLC, doing business as ADBLADE, <br><br> Plaintiff, <br><br> v. <br><br> REVCONTENT LLC, et al., <br><br> Defendants. | Civil Action No. 16-401 (MAS) (TJB) <br><br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Defendants Revcontent, LLC ("Revcontent") and John Daniel Lemp's (collectively, "Defendants") Motion for Partial Summary Judgment seeking dismissal of Plaintiff Congoo, LLC d/b/a Adblade's ("Plaintiff" or "Adblade"): (i) federal false advertising claim(s) pursuant to Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B); and (ii) state common law unfair competition claim(s), all relating solely to consumer products.[1] (Defs.' Moving Br. 5, ECF No. 98-1.) Plaintiff filed opposition (ECF No. 105) and Defendants replied (ECF No. 109). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, Defendants' Motion for Partial Summary Judgment is granted.

---

[1] Defendants do not seek summary judgment on claims based on Defendants' alleged false statements regarding their business and service, but rather on "all other claims of false advertising relating to any and all consumer products as alleged in the Amended Complaint paragraphs ¶¶ 28-78; 82-83." (Defs.' Moving Br. 1, 3 n.6, ECF No. 98-1.) Plaintiff did not include separate counts for these claims and, therefore, any consumer products claims are contained in parts of its First and Second Claims for Relief. (*See* Am. Compl. ¶¶ 85-101, ECF No. 75.)

I.   **Background**[2]

   1.   **Business Overview**

Congoo, LLC is a Delaware limited liability company with a principal place of business in New Jersey. (SODMF ¶ 1, ECF No. 105-1.) Adblade launched its online advertising business in 2008 as a subdivision of Congoo, LLC. (*Id.* at ¶ 2.) Adblade is an online advertising aggregator that serves as an "intermediary" between the advertisers publicizing their goods and services ("Advertisers") and the websites that display native advertisements[3] on their pages ("Publishers"). (*Id.*) Revcontent[4] is an Adblade competitor. (*Id.* at ¶ 13.) Aggregators like Adblade and Revcontent display Advertisers' advertisements on a Publisher's website. (*Id.* at ¶¶ 5, 7.) Aggregators typically purchase "fixed placements" on a Publisher's website where their native advertisements will be displayed each time a viewer opens a page. (*Id.* at ¶ 7.) In exchange for

---

[2] In support of their motion, Defendants submitted a Statement of Undisputed Material Facts ("SUMF"). (Defs.' Statement of Undisputed Material Facts, ECF No. 98-2.) Plaintiff filed a Combined Supplemental Statement of Disputed Material Facts ("SODMF") and Responses to Defendants' Statement of Undisputed Material Facts ("Resps. to SUMF"). (Pl.'s Combined SODMF and Resps. to Defs.' SUMF, ECF No. 105-1.) For the purposes of this motion only, Defendants assume the validity of all facts set forth in the SODMF. (Defs.' Reply Br. 3, ECF No. 109.)

[3] Native advertising is a type of online advertising that is "customized and integrated as part of the published content" of a Publisher website. (SODMF ¶ 3.)

[4] Adblade purportedly disputes Revcontent's characterizations of its business. (*See id.* at ¶¶ 2, 5.) Revcontent stated that: (i) it "manages a self-service online advertising platform;" and (ii) both parties serve native advertising on Publishers' websites and are paid by advertisers per end user click on such advertisements. (*Id.*) Adblade asserts that "Revcontent does much more" and includes additional information. (*Id.* at ¶ 5.) Even though Adblade "disputed" these facts, because Plaintiff's statements "add additional facts but do not contest the asserted position," the Court deems the allegations in SUMF ¶¶ 2, 5 to be undisputed. *See Barker v. Our Lady of Mount Carmel Sch.*, No. 12-4308, 2016 WL 4571388, at *1 n.1 (D.N.J. Sept. 1, 2016) (relying on L. Civ. R. 56(b)(1)(a)).

this service, Advertisers pay aggregators a fee that is calculated by multiplying the number of website viewers' clicks on such advertisements by a "cost per click." (*Id.* ¶¶ 5, 7.)

Publishers generate significant amounts of revenue from the advertising displayed on their websites and usually contract with the aggregator who "pays the higher rate, higher guaranteed minimums, or greatest revenue." (*Id.* at ¶ 6.) There are two methods by which an aggregator passes on to a Publisher a portion of the advertising revenue generated by its service. (*See id.* at ¶¶ 8–9.) An aggregator may pay a Publisher a fee calculated by multiplying a negotiated display rate known as cost per mil ("CPM", the amount paid per 1000 impressions[5] of an advertisement) by the number of times the aggregator's advertising unit is displayed on the Publisher's website. (*Id.* at ¶ 8.) As an alternative, an aggregator may pay a Publisher a percentage of the revenue the aggregator received from Advertisers for the display of the Advertisers' advertisements on the Publisher's website. (*Id.* at ¶ 9.)

Prior to displaying an advertisement on a Publisher's website, Adblade reviews the advertisement to ensure that it comports with its advertising standards. (*Id.* at ¶ 11.) Adblade avoids doing business with Advertisers using "false and deceptive advertisements."[6] (*Id.* at ¶ 12.) If Adblade discovers an advertisement in its inventory that it believes is false or misleading, it will "remove or cancel" it. (*Id.*)

---

[5] "An 'impression' occurs when an advertisement is 'served' or displayed onto a web page." (SODMF ¶ 8.)

[6] Such advertisements include "[n]egative option membership charges or undisclosed rebills whereby the advertisement represents that a trial size of a product (*e.g.*, skin cream, diet pill, muscle pill) can be obtained 'free' or risk free or for only a shipping fee, but hides language in terms and conditions that the customer is automatically entered into a membership at some high amount." (*Id.* at ¶ 12.)

3

The subject of this dispute is direct response advertising, a subset of native advertising that seeks consumer action, *e.g.*, an online purchase. (*Id.*) When a user clicks on a direct response advertisement, the user navigates to a "landing page" that endorses the good or service, followed by an "order page" where the user may purchase the advertised good or service. (*Id.* at ¶ 4.)

### 2. Adblade's Loss of Publishers

"From 2008 through 2014," Adblade was a market leader and its business thrived. (*Id.* at ¶ 10.) By about early 2015, however, Adblade discovered that Revcontent was promising Adblade Publishers deals with better economic terms in order to obtain Publishers' business. (*Id.* at ¶ 13.) Revcontent was able to provide greater revenue to Publishers through its "use[] [of] false and misleading ads that obtain higher CPMs."[7] (*Id.* at ¶ 15.)

Revcontent's algorithm selects the advertisements that will be displayed on a Publisher's website. (*Id.* at ¶ 16.) The most important factors in the selection process are an advertisement's "cost-per-click" and "click through rate." (*Id.*) Revcontent knows that certain types of "false and misleading" advertisements "(*e.g.*, skin cream, diet pills, [and] muscle pills)" likely contain "undisclosed rebills and typically earn higher CPMs." (*Id.* at ¶ 15.) Consequently, the algorithm "automatically" displays "false and misleading" advertisements on Publishers' websites because they "have the highest CPM and revenue to be generated." (*Id.* at ¶ 16.)

A third-party report by Adbeat, a well-known industry data source, confirms that the most popular advertisements in Revcontent's network are in fact "false and misleading." (*Id.* at ¶ 17.) For example, the report stated that Revcontent's top mobile advertisements from March 2, 2015 through March 1, 2016 included those for diet pills, muscle pills, and skin cream. (*Id.* at ¶ 18.) In

---

[7] Additionally, Revcontent guidelines and its advertising representatives' and compliance team members' communications demonstrate that Revcontent assists with creation of "false and misleading" advertisements as well. (*Id.* at ¶ 22.)

4

addition, Adblade's expert, Dr. Nashed, has provided hundreds of copies and videos of such advertisements to the Court. (*Id.* at ¶ 19.) Adblade also states that from April 29, 2015 through April 28, 2016, Revcontent displayed false and misleading diet pill advertisements on five top Revcontent publishers that previously did business with Adblade. (*Id.* at ¶ 20.) The "same situation was revealed"[8] for false and misleading muscle pill and skin cream advertisements. (*Id.*)

Revcontent has "devastated" Adblade's business by stealing a minimum of fifty-eight Publishers from Adblade since early 2015 because Revcontent offered higher revenues earned through its display of "false and misleading" advertisements. (*Id.* at ¶ 24.) It "trick[ed]" consumers into purchasing the advertised product, thereby earning Advertisers greater revenue, and enabling Advertisers to spend more money with Revcontent. (*Id.* at ¶ 21.) Revcontent, in turn, could offer Publishers deals with better economic terms. (*Id.*)

## II. Legal Standard

Summary judgment is appropriate if the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is a fact "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A material fact raises a "genuine" dispute if "a reasonable jury could return a verdict for the non-moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 250). To determine whether a genuine dispute of material fact exists, the Court must consider all facts and reasonable inferences in a light most favorable to the non-movant. *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

---

[8] The Court notes that Plaintiff's description is unclear. It appears, however, that Plaintiff means to state that false and misleading muscle pill and skin cream advertisements were displayed on the same five Publishers' websites.

5

The party moving for summary judgment has the initial burden of proving an absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "Thereafter, the nonmoving party creates a genuine dispute of material fact if sufficient evidence is provided to allow a reasonable jury to find for him at trial." *Id.* (citing *Anderson*, 477 U.S. at 248).

### III. Defendants' Motion for Partial Summary Judgment

Defendants seek partial summary judgment and dismissal of Plaintiff's: (i) federal false advertising claim(s) pursuant to Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B);[9] and (ii) state common law unfair competition claim(s), all relating solely to consumer products.

#### A. Section 43(a) of the Lanham Act

##### 1. Standing

As the parties correctly indicate, in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014),[10] the Supreme Court set forth a two-part test to

---

[9] Section 1125(a)(1)(B) provides, in pertinent part:

> "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

[10] As the parties are familiar with the facts of the case, the Court discusses them briefly here. The case involved a dispute between Lexmark, a printer and toner cartridge manufacturer, and Static Control, a manufacturer of parts used in the refurbishment and resale of Lexmark toner cartridges. *Lexmark*, 134 S. Ct. at 1383, 1384. To discourage consumers from selling empty toner cartridges to a remanufacturer, Lexmark enacted and advertised a "Prebate" program that provided customers with a twenty percent discount on new toner cartridges if they returned their used cartridges to Lexmark. *Id.* at 1383. Each Lexmark cartridge contained a microchip that disabled a cartridge when empty and had to be replaced for the cartridge to be reused. *Id.* Static Control produced a

determine if a plaintiff has standing to sue under § 1125(a) of the Lanham Act. The Court held that the key inquiry in the standing analysis is "[w]hether [a plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue under § 1125(a). In other words, we ask whether [a plaintiff] has a cause of action under the statute." *Lexmark*, 134 S. Ct. at 1387. First, a plaintiff's interests must "fall within the zone of interests protected by the law invoked." *Id.* at 1388. In the context of a § 1125(a) false advertising claim, this means that "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 1390. Second, a § 1125(a) plaintiff must demonstrate that its alleged harm was proximately caused by the false advertising. *Id.* The Court noted, however, that "the intervening step of consumer deception" does not necessarily break the chain of proximate causation. *Id.* at 1391. A plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* In addition, "[t]hat showing is generally not made when the deception produced injuries to a fellow commercial actor that in turn affect the plaintiff." *Id.*

The *Lexmark* Court held that Static Control sufficiently alleged that it had standing to bring a Lanham Act false advertising claim. *Id.* at 1395. First, the Court declared that Static Control

---

substitute for Lexmark's microchip and sold it to remanufacturers, who were then able to refurbish and resell Lexmark cartridges. *Id.* at 1384. Lexmark brought suit against Static Control for copyright violations and Static Control counterclaimed for, among other things, false advertising under the Lanham Act. *Id.* Static Control alleged that: (i) Lexmark's description of the Prebate program on cartridge packaging mislead consumers into believing "that they [were] legally bound by the Prebate terms" and must return empty cartridges to Lexmark; and (ii) Lexmark's letters to remanufacturers "falsely advis[ed] those companies that it was illegal to sell refurbished Prebate cartridges . . . and to use Static Control's products" in the process. *Id.* Static Control further asserted that Lexmark's falsehoods "proximately caused and [we]re likely to cause injury to [Static Control] by diverting sales from [Static Control] to Lexmark and had substantially injured [its] business reputation by leading consumers and others in the trade to believe that [Static Control was] engaged in illegal conduct." *Id.* (quotations omitted) (alterations in original).

7

fell within the statutory "zone of interests" because its "alleged injuries—lost sales and damage to its business reputation—are injuries to precisely the sorts of commercial interests the Act protects." *Id.* at 1393. Second, the Court held that Static Control's allegations of proximate causation passed muster because, among other things, it "alleg[ed] that it designed, manufactured, and sold microchips" required in and used solely for the remanufacture of Lexmark cartridges. *Id.* at 1394. The Court stated, therefore, that "any false advertising that reduced the remanufacturers' business necessarily injured Static Control as well" and in this case, "there is likely to be something very close to a 1:1 relationship between the number of refurbished Prebate cartridges sold (or not sold) by the remanufacturers and the number of Prebate microchips sold (or not sold) by Static Control." *Id.*

The Court noted that because of "the intervening link of injury to the remanufacturers," there was an indirect connection between Static Control's alleged harm and the deception of consumers. *Id.* Additionally, the Court noted that if it applied "the general tendency not to stretch proximate causation beyond the first step," Static Control's allegations may not support a finding of standing; however, there is typically a disconnect "between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct), but might instead have resulted from any number of [other] reasons[—t]hat is not the case here." *Id.*

### 2. Analysis

The Court agrees with Defendants' application of *Lexmark* to the facts of this case and finds that Plaintiff fails to demonstrate that the harm it suffered was proximately caused by any false advertising. The Court summarizes and evaluates the parties' arguments below.

8

### (a) Defendants' Arguments

For the purposes of this motion only, Defendants do not contest: (i) that Plaintiff satisfies the first prong of the *Lexmark* test, and its interests fall within the "zone of interests" protected by a false advertising claim under § 1125(a) (Defs.' Moving Br. 6 n.10); and (ii) that there is a causal connection between supposedly deceptive native advertising and Plaintiff's loss of Publisher clients (Defs.' Reply Br. 4). Defendants, however, argue that Plaintiff fails the second prong of the *Lexmark* test because Defendants' purportedly false advertising does not have a sufficiently close causal link to Plaintiff's alleged harm. (*Id.*) Defendants argue that although the *Lexmark* court extended Lanham Act standing to an entity that did not directly compete with the seller of the misleadingly advertised product, the *Lexmark* plaintiff supplied "a critical product component intricately tied" to such item. (Defs.' Moving Br. 8.) Accordingly, Defendants maintain that the only proper plaintiffs in the instant case are entities that suffer direct harm from the false advertisements—competitors of the falsely advertised product, its manufacturers, distributors, and shippers, and entities that make ingredients, packaging and labeling supplies for the falsely advertised product. (*Id.* at 9.) Defendants contend that "there is no formula equating merchant sales of consumer goods with marketing revenue of Revcontent or Adblade, let alone a 1:1 relationship." (*Id.*)

### (b) Plaintiff's Arguments

In opposition, Plaintiff primarily[11] argues that: (i) Defendants' analysis is based on a misunderstanding of *Lexmark's* holding, as the case does not limit proximate causation of harm to

---

[11] Plaintiff also argues that the Court previously denied Defendants' motion to dismiss for lack of standing and Defendants inappropriately raise the same argument at summary judgment. (Pl.'s Opp'n. Br. 1.) Defendants, however, may make a similar argument at the summary judgment stage as the Court now considers facts outside of the pleadings and applies a different standard of review. *Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc.*, No. 10-cv-5321, 2014 WL

9

competitors and those in the market for falsely advertised products; and (ii) Plaintiff has submitted facts that establish that its injuries flow directly from Defendant's false and misleading advertisements. (Pl.'s Opp'n. Br. 1–2.)

Plaintiff asserts that *Lexmark* does not limit finding proximate causation of harm to only the competitors of falsely advertised products and those participating in the marketplace, as Defendants purportedly claim, and instead, *Lexmark* simply rejected injuries that were "too remote" from the unlawful conduct. (*Id.* at 13.) Such injuries include the "misfortunes visited upon a third person by the defendant's acts" *e.g.*, the harms suffered by "the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's inability to meet its financial obligations." (*Id.* (quoting *Lexmark*, 134 S. Ct. at 1390–91).) Plaintiff argues that its injuries are more closely connected to Defendants' conduct than the harms suffered by these examples. (*Id.* at 13–14.)

Additionally, Plaintiff states that it has submitted facts demonstrating that it suffered direct injury.[12] (Pl.'s Opp'n. Br. 16 (citing SODMF ¶¶ 13–22).) Plaintiff claims that Defendants

---

1908500, at *3 (D.N.J. May 13, 2014) ("A non-moving party must make a greater showing to survive a motion for summary judgment than a motion to dismiss. In addition to the fact that a plaintiff presumably has had an opportunity to obtain [facts] during discovery, a motion for summary judgment is reviewed under a much more stringent standard than a motion to dismiss for failure to state a claim.") (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quotation omitted)). Moreover, the Court previously held only that Plaintiff sufficiently *alleged* standing. The Court, therefore, finds that this argument lacks merit.

[12] Adblade purportedly disputes two of Defendants' statements in Defendants' SUMF, taking issue with the characterization of the connection between the allegedly false advertising and Adblade's suffered harm, set forth above. (Pl.'s Resps. to SUMF ¶¶ 11, 12.) Adblade asserts that "the proximate cause is not the result of a 'long chain of events'" (*id.* at ¶ 11) and instead, "the injury to its commercial business is the direct result of Revcontent's participation in the content of and use of false and misleading ads that will generate higher revenue that Revcontent offers to Adblade's publishers" (*id.* at ¶ 12). For reasons explained above, the Court is not persuaded by Adblade's argument.

10

improperly derived its characterization of Plaintiff's theory from its cross-examination of Adblade witness Rafael Cosentino during the preliminary injunction hearing. (Pl.'s Reply Br. 15–16.) Adblade asserts that: (i) his testimony is irrelevant as neither party sells the products featured in the advertisements in question; (ii) Cosentino was not offered to speak to Adblade's theory of causation; and (iii) Adblade included a proper statement of proximate causation in its Amended Complaint. (*Id.*) Plaintiff does not challenge the accuracy of Defendants' summary of Cosentino's testimony. (*See id.*)

### (c) Discussion

The Court finds merit in Defendants' application of *Lexmark* and Plaintiff has failed to provide facts supporting a sufficiently close connection between the alleged false advertising and harm suffered. Any causal link is too attenuated to pass muster under *Lexmark's* reasoning. Generally, the determination of proximate causation is "left to the jury for its factual determination." *Crowley v. Chait*, No. 85-2441, 2004 WL 5434953, at *7 (D.N.J. Aug. 25, 2004) (citing *Jakelsky v. Friehling*, 33 F. Supp. 2d 359, 365 (D.N.J. 1999); *Cruz-Mendez v. ISU/Ins. Servs. of San Francisco*, 722 A.2d 515, 525 (N.J. 1999)). In many cases, a jury must resolve "a factual dispute as to events and circumstances which caused injuries." *Id.* (citing *Melone v. Jersey Cent. Power & Light Co.*, 113 A.2d 13, 20 (N.J. 1955)). "The issue can be addressed, as a matter of law, only where the outcome is clear or when highly extraordinary events or conduct takes place." *Id.* (citing *Jakelsky*, 33 F. Supp. 2d at 365). The Court finds that the outcome is clear in the instant case.

It is true that the *Lexmark* court did not limit standing to direct competitors in the industry for the falsely advertised product, and the intervening injury to the remanufacturers created an indirect connection between Static Control's alleged harm and the deception of consumers. The

*Lexmark* Court, however, emphasized that the connection between the remanufacturer, who was the competitor in the market, and Static Control was still a very close one: "[A]ny false advertising that reduced the remanufacturers' business **necessarily** injured Static Control as well. . . . [T]here is likely to be something **very close to a 1:1 relationship** between a number of refurbished Prebate cartridges sold (or not sold) by the remanufacturers and the number of Prebate microchips sold (or not sold) by Static Control." *Lexmark*, 134 S. Ct. at 1394 (emphasis added).

In this case, Plaintiff has set forth facts demonstrating a situation where, unlike in *Lexmark*, a disconnect exists "between the injury to the direct victim"—here, competitors of falsely advertised goods—and its own injuries as an indirect victim, unlike the injuries to companies supporting those competitors in the marketplace.[13] *Id*. Plaintiff's alleged injury—loss of Publisher clients—is "not surely attributable" to injury to a competitor, and correspondingly, to Defendants' conduct; instead, Plaintiff's injury may have "resulted from any number of [other] reasons."[14] *Id*. (internal quotation and citation omitted).

As reflected in Dr. Nashed's declaration and in Mr. Cosentino's testimony, tracing Plaintiff's alleged harm to any false advertising requires a series of steps. (*See* SODMF ¶ 21; Tr. of July 7, 2016 Prelim. Inj. Hr'g 161–64, ECF No. 57.) The Court finds Plaintiff's arguments

---

[13] Plaintiff attempts to distinguish this case from two cases outside of the Third Circuit where courts found that granting summary judgment was appropriate when the non-movants failed to submit any evidence to establish proximate causation. (Pl.'s Opp'n. Br. 20–21 (citing *Maine Springs, LLC v. Nestle Waters North Am., Inc.*, No. 2:14-cv-00321, 2015 WL 1241571 (D. Me. Mar. 18, 2015) and *Muhler Co. v. Ply Gem Holdings, Inc.*, 637 F. App'x 746 (4th Cir. 2016)).) Here, the Court finds the evidence submitted by Plaintiff to be insufficient to raise a dispute of material fact under *Lexmark*.

[14] Plaintiff argues that: (i) Defendants failed to submit any evidence that Adblade's injuries were caused by other factors; and (ii) Defendants' false and misleading advertisements need not be the sole cause of injury to be the proximate cause. (Pl.'s Opp'n. Br. 21–22.) The Court, however, notes that neither argument is dispositive under *Lexmark's* holding.

regarding the utility of Mr. Cosentino's testimony unpersuasive. Whether Mr. Cosentino was offered to speak to Plaintiff's theory is irrelevant. His statements are part of the record. Given that this litigation has progressed past mere review of the pleadings, Plaintiff's referral to the statement of harm in its Amended Complaint is unconvincing. Importantly, in its SODMF, Plaintiff cites to a declaration of its CEO and expert, Dr. Nashed, in support of its case. (SODMF ¶ 21.) Plaintiff's description of the language in Dr. Nashed's declaration essentially tracks the substance of Mr. Cosentino's testimony. (*Compare* SODMF ¶ 21, *with* Tr. of July 7, 2016 Prelim. Inj. Hr'g 161–64.) Dr. Nashed stated that false and misleading advertisements deceive consumers into clicking on the advertisements and/or making purchases, thereby:

> enabl[ing] the unscrupulous advertiser to make high cost-per-click bids to an advertising aggregator, such as Revcontent, who in turn offers higher rates to a publisher to obtain its business. The false and misleading ads "trick" consumers into making a purchase they would not have otherwise made and results in higher advertising revenues. In addition, native ads that are deceptive and misleading likely have higher click-through rates that also translates into a greater revenue to the publishers.

(SODMF ¶ 21.)

Defendants summarize Mr. Cosentino's testimony and the accuracy of such summary is uncontested by Plaintiff:

> (1) consumer products were deceptively advertised online through false advertising; (2) consumer products sold by way of false advertising generated greater sales, which in turn provided greater revenue to the merchants selling those consumer products; (3) the Advertisers promoting these merchants' consumer products received higher revenues as a result; (4) these Advertisers were able to pay portions of this increased revenue to Revcontent; (5) this increased revenue to Revcontent enabled it to pay its Publishers more money than Adblade was able to pay to its Publishers; (6) which in turn caused Adblade's Publishers to leave Adblade and work with Revcontent; (7) with resulting harm to Adblade.

(Defs.' Reply Br. 5.) While Dr. Nashed and Mr. Cosentino may have presented each step in a different order, the substance of the statements is largely equivalent. Accordingly, the Court finds

13

that there is no dispute as to a material fact regarding the chain of causation and such causal connection is insufficient to provide Plaintiff with standing under *Lexmark*.

B.   **State Common Law Unfair Competition**

Defendants contend that the analysis of Plaintiff's Lanham Act claim applies to Plaintiff's common law unfair competition claim because the elements and scope of the federal and state law claims are the same. (Defs.' Moving Br. 5, n.7; Defs.' Reply Br. 11.) In opposition, Plaintiff argues that its common law unfair competition claim is neither factually nor legally identical to its Lanham Act claim. (*See* Pl.'s Opp'n Br. 22–23.)

First, Plaintiff asserts that its common law unfair competition claim is broader than its Lanham Act claim because its common law claim additionally alleges "that Adblade cannot compete fairly with Revcontent because it does not use false and misleading advertisements, and **Adblade has been forced to match Revcontent's rates which have eroded Adblade's profits**." (*Id*. at 22) (emphasis added). In its Lanham Act claim, however, Plaintiff alleges the following:

> **By its false and misleading representations** in advertisements, Defendants and Defendants' Advertisers have been able to generate greater income from ads and **thereby to offer their services at more attractive rates** to Plaintiff's Publishers than Plaintiff can **because Plaintiff does not employ false and misleading** representations in its advertising. Thus, by their acts of false and misleading advertising, Defendants have **succeeded in eroding significantly Plaintiff's market share and injuring Plaintiff's goodwill**.

(Am. Compl. ¶¶ 91) (emphasis added). The Court finds, therefore, sufficient similarity in Plaintiff's Lanham Act allegations and common law claim to find that the allegations are substantively the same.

Second, Plaintiff argues that its "unfair competition claim also includes allegations that Defendants have made fraudulent representations to publishers." (Pl.'s Opp'n Br. 22.) Any claims based on Revcontent's purported fraudulent representations to Publishers that relate to consumer

14

products are within the scope of Defendants' motion for partial summary judgment. To the extent, however, that any allegations of fraudulent representations do not relate to consumer products, the Court finds that claims based on those purported fraudulent representations survive.

"[T]he federal law of unfair competition under § 43(a) is not significantly different from the New Jersey [common] law of unfair competition and [courts] have applied the identical test to both claims."[15] *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1433 (3d Cir. 1994) (quotations omitted); *see also CSC Holdings, LLC v. Optimum Networks, Inc.*, 731 F. Supp. 2d 400, 411 (D.N.J. 2010) ("Because, as discussed, plaintiff has stated a claim for unfair competition under Section 43(a) of the Lanham Act, the Court finds that plaintiff also has stated a claim for unfair competition under New Jersey statutory and common law.") Accordingly, the Court's Lanham Act analysis applies to Plaintiff's analogous common law unfair competition claim with respect to consumer products, and the Court grants Defendants partial summary judgment.

---

[15] Plaintiff also contends that the elements of a Lanham Act false advertising claim and a common law unfair competition claim are not the same and argues that the "common law of unfair competition is amorphous" and "flexible." (Pl.'s Opp'n Br. 23 (citing *Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, No. 09-3125, 2011 WL 773034 (D.N.J. Feb. 28, 2011).) The *Reckitt* case, however, deals with a state law unfair competition claim that is not based upon allegedly false representations and the Reckitt plaintiff did not bring a Lanham Act claim; therefore, it is distinguishable from the instant case.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Partial Summary Judgment is granted. An order consistent with this Opinion will be entered.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: November 3, 2017